## FOX et al. v. ROTHENSIES, Collector of Internal Revenue.

### No. 7284.

Circuit Court of Appeals, Third Circuit.

Sept. 30, 1940.

Edwin Hall, 2d, and Harry J. Alker, Jr., both of Philadelphia, Pa., for appellants.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and W. Croft Jennings, Sp. Assts. to Atty. Gen., for appellee.

Before MARIS, CLARK, and JONES, Circuit Judges.

CLARK, Circuit Judge.

The trial of the case in the District Court reflects a confused procedure. The confusion inheres in the diversity of the taxpayer's remedies and forums. He can sue the Collector personally as at common law (clearly anachronistic and circumlocutory),[1] he can sue the United States in the Court of Claims,[2] or in the District Court sitting (within a financial limitation) as a Court of Claims,[3] and he can avail himself of a petition to a quasi-judicial body, the Board of Tax Appeals.[4]

These varying procedures may and do give rise to varying results for both a practicable and a theoretical reason. Practically, the preparation and trial of tax cases may and does vary with their conduct by the prosecuting and the tax branches of the Department of Justice respectively. Theoretically, their decision may and does vary with the state of the law upon the true province of the fact trier. We illustrate in both aspects from the case at bar. The taxpayer selected as her remedy and forum a suit against the Collector in the District Court. By choosing this ancient and anomalous action she preserved her right to a jury, Bickford, Court Procedure in Federal Tax Cases (Rev.Ed.), above cited, p. 157. Had she not waived it, she might have further complicated the fact finding problem, Holmes and Brewster's Federal Tax Appeals, above cited, pp. 368, 369.

By concession, the tax turns on certain transfers of cash and real estate as be-

---

[1] Bickford, Court Procedure in Federal Tax Cases (Rev.Ed.) pp. 111–113; Holmes and Brewster's Federal Tax Appeals p. 354.

[2] Holmes and Brewster, above cited, p. 399.

[3] Bickford, above cited, p. 132; Holmes and Brewster, above cited, p. 393.

[4] 5 Paul & Mertens, Law of Federal Income Taxation, Chapters 43 and 44; and see generally, Paul & Mertens, above cited, p. 658 et seq.; Holmes Federal Taxes (6th Ed.), Chapters 40 and 41.

tween a husband and wife. The question arises under section 302 (e) of the Revenue Act of 1926, 26 U.S.C.A. Int.Rev. Code, § 811 (e), which requires the inclusion in a decedent's estate for purposes of estate tax of property held by entireties except such part thereof as may be shown to have originally belonged to the surviving spouse "and never to have been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth". The wife acquired (by inheritance) certain monies which she kept as her separate estate in a Philadelphia bank. The husband owned, from 1901 to 1931, a certain country place in which both they and their sons (now, with their mother, executors of their father's estate) lived. From 1913 through 1921, the wife expended $12,000 of her separate principal, and at minimum, $36,000 of her separate income for the upkeep of the household and the schooling of the two children. The phenomenon of 1929 brought about the usual decline in the husband's fortune and in 1931 he conveyed the country place, appraised for this suit at $40,000, through a straw man to himself and his wife as tenants by entireties. This conveyance, according to one son and the family lawyer, occurred after, and so probably as the result of, some intramural difficulty.

This recital imports a certain vagueness. We are dealing with bank accounts in a named bank and the use of the money deposited therein. Yet, the testimony offered is entirely oral and the government makes no attempt to compel a surely existing documentary corroboration. This, in spite of the fact that the witness wife is constrained to recall the source, purpose, and minutiae of cash disbursements occurring some 26 years previously. We think that the United States Attorney might well have spared her that burden and the

learned district judge and ourselves that disadvantage.

Nor are the findings of fact and conclusions of law of much more assistance. The pertinent ones (finding of fact #11 and conclusion of law #2) are substantially in haec verba. That they should be so illustrates the artificial character of the whole procedure as now prescribed.[5] That was not, however, really in controversy. The testimony of the wife, her sons, and their lawyer, relates what actually happened. That actual happening appears in the examination of the widow:

"Q. There was no understanding at all when you first made the payment with your husband, was there? A. No.

"Q. In other words, the deed of the transfer of the property is when he said he wanted to repay you back for what you had done? A. Yes."

Record p. 17

and in the reiterated use by her, R. 14, and by her sons J. L. and C. P. Fox, R. 22, 26, of the word "reimburse" and by her, R. 14, and the family solicitor, R. 29, of the cognate "compensate". We inserted the phrase "so far as they were allowed to go" for the reason that we do not understand the exclusion of statements of the dead father. We are quite cognizant of the statutory provision making this much criticized[6] rule part of the law of Pennsylvania, 28 P.S. § 322. We had never heard, however, that it applied to inheritance tax proceedings in Pennsylvania[7] or anywhere else.[8] The witnesses' interest is obviously in favor rather than adverse to the estate. As the plaintiff-appellants' exception is not pressed, we pass the point.

What was in dispute was not an express agreement, of any kind, but the existence or non-existence of an implied agreement. As to this both the findings

---

[5] Holtzoff, New Federal Procedure and the Courts, p. 131; Federal Rules of Civil Procedure and Proceedings of the American Bar Association Institute p. 316, et seq., p. 383, et seq.; Federal Rules of Civil Procedure, Proceedings of Institutes, published by the American Bar Association, pp. 80, 84, 127, 165, 287; Clark and Stone, Review of Findings of Fact, 4 University of Chicago Law Review 190.

[6] Ladd, Admission of Evidence Against

Estates of Deceased Persons, 19 Iowa Law Review 521, 524; The Law of Evidence published by the Yale University Press, p. 24; 63 Reports of the American Bar Association p. 581.

[7] In re Esbenshade's Estate, 6 Pa.Dist. & Co.R. 520, 39 Lanc.Law Rev. 339, 17 Del. 78, 73 Pittsb.Leg.J. 779; In re Watson's Estate, 23 Pa.Dist. & Co.R. 669.

[8] Greenfield, Testimony Under Section 347 Civil Practice Act, Sec. 149, p. 225; 70 C.J. p. 206.

and the opinion are silent. The legal potency of such agreements has been long acknowledged.[9] Sir Henry Maine in his Ancient Law defined them as follows:[10] " * * * In implied contracts, acts and circumstances are the symbols of the same ingredients which are symbolized, in express contracts, by words; and whether a man employs one set of symbols or the other must be a matter of indifference so far as concerns the theory of agreement." Pages 343-346 (4th Ed.).

The circumstances here are a biological difference and a relationship arising out of that difference. The law has recognized, first, that certain consequences, physical, mental, and emotional, flow from the difference and, second, that the marriage relationship based on the difference does, by way of action and reaction, itself accentuate those consequences. The illustrations are too numerous for exhaustive mention. We list, under their appropriate tag, some specific rules that come to mind. They are:[11] common disaster, independent advice (in this case even pre-marital), husband's coercion to wife's crime, husband's liability for wife's torts, necessaries, and support even after divorce, a married woman's capacity to contract, to hold separate property, and as an accommodator on negotiable paper. Any understanding of these rules requires the acknowledgment of three factors. Any one of them may place its ratio decidendi upon more than one consequence and upon the impact of the relationship thereon. Although the difference is static, the lawmakers' conception thereof may shift and finally the rule may be ironclad or it may be bottomed on probabilities and so speak in their legal equivalent, rebuttable presumptions.[12]

█ It is possible, however, to detect at least one common denominator. It may well be termed the weaker vessel philosophy (or in reverse, dominance). Our decision turns upon the incidence of its application to the narrow field of the principal case. We are dealing here with what Mr. Paul has called "not Federal tax law at all but non-tax state law", Paul, Selected Studies in Federal Taxation (2nd Series), Local Rules of Property, p. 1. We are bound then by those "local rules of property" and hence by the decisions of the highest courts of Pennsylvania, Buck v. Helvering, 9 Cir., 73 F.2d 760, 764; Richardson v. Helvering, 65 App.D.C. 105, 80 F.2d 548, 551.

█ Many jurisdictions, including in part the courts of Pennsylvania, split the weaker vessel into two compartments. They hold her to be strong as to her income and weak as to her principal.[13] The

---

[9] Keener, Quasi-Contract, Its Nature and Scope, 7 Harvard Law Review 57, 59; Costigan, Implied-In-Fact Contracts and Mutual Assent, 33 Harvard Law Review 376, 381.

[10] More recently the American Law Institute defined them as follows:

"Except as stated in sec. 72(2), a promise in a contract must be stated in such words either oral or written, or must be inferred wholly or partly from such conduct, as justifies the promisee in understanding that the promisor intended to make a promise."

"Comment:

"a. Contracts are often spoken of as express or implied. The distinction involves, however, no difference in legal effect, but lies merely in the mode of manifesting assent. Implied contracts must be distinguished from quasi-contracts, which also have often been called implied contracts or contracts implied in law."

1 Restatement of the Law of Contracts, Ch. 1, p. 7, sec. 5.

Compare 1 Williston on Contracts, sec. 21, pp. 34, 35; cases collected in 20 Words & Phrases, Permanent Edition, p. 223 et seq.

[11] See especially, Tracy and Adams, Evidence of Survivorship in Common Disaster Cases, 38 Michigan Law Review 801; Inter Vivos Gift by Woman to Fiance Presumed to Have Been Obtained by Undue Influence, 52 Harvard Law Review 529; Independent Advice, 173 L.T. 149-50; Liability of Husband for Necessaries, Attorney's Fees in Divorce Action, 21 St. Louis Law Review 89; Koontz, Liability of the Husband for the Torts of His Wife, 41 Dickinson Law Review 55; Collier, Presumption of Coercion by Husband Where Wife Commits Crime Prima Facie Only, 72 Cent.L.J. 139.

[12] Morgan, Some Observations Concerning Presumptions, 44 Harvard Law Review 906.

[13] Bergey's Appeal, 60 Pa. 408, 416, 100 Am.Dec. 578; Sawtelle's Appeal, 84 Pa. 306; Darlington's Appeal, 86 Pa. 512, 27 Am.Rep. 726; Hamill's Appeal, 88 Pa. 363; Earnest's Appeal, 106 Pa. 310; Wormley's Estate, 137 Pa. 101, 20 A. 621; Hauer's Estate, 140 Pa. 420, 21 A. 445, 23 Am.St.Rep. 245; Nichols v. Nichols, 149 Pa. 172, 24 A. 194; Kittel's Estate, 156 Pa. 445, 26 A. 1116; Martin's

rationale of the rule has been put: "The rule that a loan is presumed is based upon the realization that a wife commonly intrusts the management of her business to her husband, and the rule that a gift is presumed, upon the contention that 'emancipated' woman is afforded the same opportunity to protect her property rights as is her husband." Husband and Wife—Presumptions—Transfer of Property from Wife to Husband, 11 North Carolina Law Review 84, 88 (note). It has been criticized.[14] We said "in part the courts of Pennsylvania" because we detect a qualification in their rule. It is just into that qualification we think the principal case fits. The presumption of loan arises from the theory of dominance of which we have spoken. That would seem to require receipt and possession and the cases so indicate.[15] Here the monies expended, although principal, were laid out directly by the wife and were laid out by her for the common purposes of the family.[16] We think this brings them, whether from principal or income, within the reasoning of Chief Justice Tilghman when he said: "And there is great reason for this presumption, because the husband, being in the receipt of this money, may be induced to live at a greater expense than he would otherwise have done, whereby the comforts of his wife, as well as his own, are increased. To call him to account, therefore, after the lapse of a number of years, might be ruinous, and would certainly be unjust." Mr. Chief Justice Tilghman, In re McGlinsey's Appeal, 14 Serg. & R., Pa., 64. The learned district judge correctly stated the general rule but avoided any necessity for its qualification because of his feeling that the wife's testimony permitted the inference of a gift. The natural fact is that

she spent first and thought afterwards. We prefer, therefore, to accept Chief Justice Tilghman's judgment from conduct, particularly as it seems to us in line with current estimates of the relations between the sexes.

The judgment of the district court is affirmed.

Estate, 181 Pa. 378, 37 A. 561; Griffith v. Griffith, 187 Pa. 306, 41 A. 30; Waslee v. Rossman, 231 Pa. 219, 80 A. 643; Buckley v. Buckley, 277 Pa. 215, 120 A. 926; Loeffler's Estate, 277 Pa. 317, 121 A. 186.

Incidentally, the United States Supreme Court in an early case, Stickney v. Stickney, 131 U.S. 227, 9 S.Ct. 677, 33 L.Ed. 136, expressly adopted and has since followed, Commissioner v. Molter, 10 Cir., 60 F.2d 498, the same rule.

14 Evidence—Presumption from Delivery of Money by Wife to Husband, 23 Michigan Law Review 301. Spruance v. Equitable Trust Co., 12 Del.Ch. 12, 103 A. 577.

15 Buckley v. Buckley, 277 Pa. 215, 120 A. 926; Loeffler's Estate, 277 Pa. 317, 121 A. 186.

16 The testimony reads:

"Q. Expenses in connection with running the household of yourself and your husband? A. Or my sons' schooling.

"Q. Or your sons' schooling. A. Or things like that.

"Q. Or things like that. But I mean, you didn't put any money directly into the purchase of the property? A. No.

* * *

"A. Yes, I always did help with things.

"Q. You always did help? A. I had helped, yes."

Record, pp. 40, 41.