ESTATE OF MAURICE H. HONICKMAN, DECEASED, KATE HONICKMAN, HAROLD A. HONICKMAN AND GIRARD TRUST BANK, COEXECUTORS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3660–69. Filed April 26, 1972.

*Patrick W. Kittredge,* for the petitioners.
*Mary Ann Hagan,* for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency of $23,-237.73 in the Federal estate tax of the Estate of Maurice H. Honickman. Due to concessions by both parties, the only two issues remaining for our consideration are:

(1) Whether the transfer of certain property in trust by the decedent within the 3 years preceding his death was made "in contemplation of death," as that term is used in section 2035,[1] and

(2) Whether the decedent's wife had a valid claim against her

---

[1] All references are to the Internal Revenue Code of 1954, as amended.

husband's estate for Federal income taxes paid by her on her husband's behalf from 1948 through 1965.

GENERAL FINDINGS OF FACT

Some of the facts have been stipulated and, together with the exhibits related thereto, are incorporated herein by this reference.

Maurice H. Honickman (hereinafter sometimes referred to as the decedent) died testate, a resident of Pennsylvania, on February 14, 1965. His will, duly probated, named Kate Honickman, the decedent's wife (hereinafter sometimes referred to as Kate), his son, Harold A. Honickman, and the Girard Trust Bank as coexecutors; all coexecutors either resided or had their principal place of business in Pennsylvania at the time the petition herein was filed. A Federal estate tax return was timely filed on or about May 13, 1966.

## Issue 1. Gift in Contemplation of Death

### FINDINGS OF FACT

To the extent applicable, the findings of fact as to issue 2 are incorporated herein by this reference.

The decedent and Kate were married on May 31, 1924, and lived in marital harmony until his death 41 years later.

On July 29, 1963, the decedent was the owner of nine insurance policies on his own life. On that date, the cash value of these policies totaled $79,140.59 and their face value was $120,000. Also on that date, the policies, together with certain shares of stock, were pledged to the Girard Trust Corn Exchange Bank as collateral for outstanding demand loans made by the bank to the decedent. Kate was a "contingent liability guarantor" on the loans.

The accounts of the bank with respect to these loans show the following in composite:

| Date | Loans made | Payments of principal |
|---|---|---|
| 2/3/53 | $10,000.00 | |
| 3/12/56 | | $10,000.00 |
| 3/12/56 | 18,248.21 | |
| 4/24/57 | | 5,919.69 |
| 5/6/57 | 5,000.00 | |
| 5/28/57 | | 5,000.00 |
| 5/28/57 | 50,000.00 | |
| 7/1/57 | | 50,000.00 |
| 7/10/57 | 75,000.00 | |
| 2/5/62 | | 5,010.00 |
| Total | 158,248.21 | 75,929.69 |

Net balance as of 7/29/63, $82,318.52.

134

In addition, the accounts of the bank show that the decedent borrowed a total of $29,000 in July 1963 and repaid the same on September 26, 1963.

In June of 1963, the decedent consulted his lawyer concerning the formation of an overall estate plan for himself and his wife. His lawyer initially suggested that he transfer ownership of the aforementioned policies in order to remove them from his estate, but, upon learning that their cash value was substantial, that they were pledged as collateral for the aforementioned loans, and that they purportedly constituted the decedent's only liquid asset, he withdrew his recommendation.

On July 29, 1963, the decedent executed an irrevocable trust agreement transferring the nine policies to his wife and Harold Honickman, his son, as trustees for the benefit of his wife, children, and grandchildren. Two days later, he executed his last will and testament. The dispositive provisions of the trust and the will were generally the same.

On September 26, 1963, decedent borrowed $61,318.52 from the bank, and on October 1, 1963, the balances of the previously outstanding loans were paid in full. The trustees acknowledged receipt of the assignments of the aforementioned policies between October 21, 1963, and November 29, 1963. A Federal gift tax return was filed and a tax paid based upon a gift of $79,140.59. The new loan and non-interest-bearing loans from the decedent's business, i.e., Zuckerman-Honickman, Inc., during his lifetime, in the aggregate amount of $79,778.49, were listed as debts on the estate tax return.

During the years 1955–65, Kate had in excess of $25,000 annual income of her own.

Prior to his final illness, decedent, although a heavy smoker and suffering from smoker's asthma and 50 pounds overweight, did not have any fear of imminent death. His family considered him to be an active person and he worked a normal 5-day week up to the onset of his final illness. In December of 1964, the decedent visited his doctor, who found a tumor on his left lung. The decedent was admitted to Einstein Medical Center on December 13, 1964. Following an operation which revealed the tumor to be malignant and inoperable, he was discharged on January 2, 1965. His health failed rapidly after that and he died on February 14, 1965, due to carcinoma of his left lung and liver.

ULTIMATE FINDING OF FACT

The transfers of the aforementioned nine insurance policies by decedent were made in contemplation of death.

OPINION

The question before us is whether the transfers by decedent of the ownership of certain policies of insurance on his life were made in contemplation of death so that the face values of the policies are includable in his gross estate under section 2035.[2] In view of the fact that the transfers occurred within 3 years of death, subsection (b) of that section establishes a rebuttable presumption that they were so made.

The purpose of section 2035 is "to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax." *United States* v. *Wells*, 283 U.S. 102, 117 (1931). The fact that the decedent herein was not in fear of imminent death is not controlling. See *United States* v. *Wells*, 283 U.S. at 117. The crucial question is one of fact, i.e., whether, in light of all the circumstances, the dominant motive in making the transfer was the thought of death or a purpose normally associated with life. *United States* v. *Wells, supra; Estate of Sumner Gerard*, 57 T.C. 749 (1972).

The transfers herein were made in the context of planning by the decedent, on the advice of his lawyer, for the disposition of his estate. They occurred almost simultaneously with the execution of decedent's will, and the dispositive provisions of the trust and the will were generally the same. These circumstances strongly support the statutory presumption and respondent's determination. *Davis* v. *Commissioner*, 142 F. 2d 450 (C.A. 6, 1944), affirming per curiam a Memorandum Opinion of this Court; *Oliver* v. *Bell*, 103 F. 2d 760 (C.A. 3, 1939) ; *Estate of A. Carl Borner*, 25 T.C. 584, 587 (1955) ; *Estate of Jacob Gidwitz*, 14 T.C. 1263 (1950), affd. 196 F. 2d 813 (C.A. 7, 1952).

Petitioners' arguments to counteract the foregoing considerations are not persuasive. First, they point to the testimony of decedent's lawyer to the effect that the purpose of the transfers was to place the policies beyond decedent's temptation to use them to cover gambling losses. But this testimony was extremely vague and is totally unsupported by any evidence that the decedent gambled to any degree whatsoever. Neither decedent's wife nor his son, both of whom might

[2] SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death.

(b) APPLICATION OF GENERAL RULE.—If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041 (relating to revocable transfers and powers of appointment) ; but no such transfer, relinquishment, exercise, or release made before such 3-year period shall be treated as having been made in contemplation of death.

be expected to have some inkling of decedent's gambling propensities and who testified at the trial, was questioned to any extent whatsoever in this regard. We also reject petitioners' assertion that decedent sought to put the policies beyond his reach with respect to business losses, which he might incur through borrowings or otherwise. The fact is that the last borrowing of decedent, with the exception of the one made to liquidate the outstanding loans which the policies collateralized, was made more than 6 years prior to the transfer. Such a pattern does not support the contention that decedent was concerned about gambling proclivities or the entering into business transactions clothed with unusual risks. Our lack of conviction on this score is reinforced by the further fact that decedent's wife had been called upon to guarantee his prior borrowings.[3] Finally, petitioners' assertion, supported only by the general testimony of decedent's lawyer, that decedent was desirous of providing financial security for his wife, through the possible cashing in of the policies by the trustees, is belied by the evidence that his wife had a substantial income of her own. *Hunter* v. *United States*, 14 F. Supp. 523, 532 (Ct. Cl. 1936).

In short, the gruel of petitioners' arguments is too watery to provide them with sufficient sustenance. On the basis of the record as a whole and in light of our observation of the witnesses, we hold that petitioners have failed to satisfy their burden of persuasion that the transfers in question were not made in contemplation of death, and that the face values of the insurance policies are therefore includable under section 2035. *Liebmann* v. *Hassett*, 148 F. 2d 247 (C.A. 1, 1945) ; see *Estate of Arthur H. Hull*, 38 T.C. 512, 529 (1962), reversed on other grounds sub nom. *Hull's Estate* v. *Commissioner*, 325 F. 2d 367 (C.A. 3, 1963). In so holding, we have given no weight to the fact that life insurance policies were the subject matter of the transfer, thereby avoiding the possible interplay of *Hull's Estate* v. *Commissioner*, 325 F. 2d 367 (C.A. 3, 1963), reversing 38 T.C. 512 (1962), and *Aaron's Estate* v. *Commissioner*, 224 F. 2d 314 (C.A. 3, 1955), reversing 21 T.C. 377 (1953), with *Jack E. Golsen*, 54 T.C. 742 (1970), affd. 445 F. 2d 985 (C.A. 10, 1971).

*Issue 2. Claim Against the Estate*

FINDINGS OF FACT

To the extent applicable, the findings of fact as to issue 1 are incorporated herein by this reference.

On June 4, 1943, Kate and Ida Zuckerman, wife of the decedent's business partner, purchased a piece of property. Kate's interest in

---

[3] We are unable to determine on the record before us whether decedent's wife was a guarantor of the Sept. 26, 1963, loan.

this real estate was her separate property. From 1948 through at least 1965, the property was rented to Zuckerman-Honickman, Inc., the stock of which was owned by the two husbands. All rental payments were made directly to the accountant of the two wives, who also was the accountant for Zuckerman-Honickman, Inc. The rentals were deposited in a checking account in the name of the two wives and only they were authorized to draw checks on this account. From 1948 through 1965, decedent and his wife filed joint Federal income tax returns. During that period, exclusive of the years 1952 through 1954, checks totaling $286,879.94 were drawn by Kate and used in partial payment of the Federal income tax liability of herself and decedent.[4] Of this amount, $152,855.20 was attributable to decedent's proportionate share of gross income for the aforementioned years.

On October 18, 1968, during the course of the administrative process preceding the filing of the petition herein, Kate notified the executors of her husband's estate in writing that she considered this money to be a loan and made claim therefor as a creditor of the estate. Except for the assertion herein with respect to this item, no other action has been taken by either Kate or the estate with respect to this claim. As of the date of trial, the accounting for the estate had not been completed.

## OPINION

Section 2053 allows a deduction from the gross estate "for claims against the estate * * * as are allowable by the laws of the jurisdiction * * * under which the estate is being administered." The resolution of this issue thus turns upon whether the claim of decedent's wife is valid under Pennsylvania law. See sec. 20.2053–1(b)(2), Estate Tax Regs.

At the outset, we note that respondent does not dispute the proposition that a spouse who pays more than his or her allocable share of a joint income tax liability can have a right of reimbursement or contribution against the other spouse. Sec. 20.2053–6(f), Estate Tax Regs.

Under Pennsylvania law, it seems clear that where a wife's separate property is used by the husband or for his benefit, he is presumed to have received these funds as a loan or under an obligation to repay in the nature of a constructive trust. *Shapiro* v. *Shapiro*, 424 Pa. 120, 224 A. 2d 164 (1966); *Lapayowker* v. *Lincoln College Preparatory School*, 386 Pa. 167, 125 A. 2d 451 (1956); *Wormley's Estate*, 137 Pa. 101, 20 Atl. 621 (1890). But this rule appears subject to at least two exceptions.

---

[4] Information as to the amount of such withdrawals and payments for the years 1952 through 1954 was not available, but the record clearly indicates that similar payments were made in those years.

138

First, the presumption is rebuttable and it may be defeated by a showing of laches. Although the mere passage of time will not establish laches, such a defense may be applicable under all the circumstances of a case. See *Shapiro* v. *Shapiro*, 224 A. 2d at 170. Cf. *Hauer's Estate*, 140 Pa. 420, 21 Atl. 445 (1891). We think that the course of action by decedent's wife over a continuous period of 18 years, which included not only the failure to make any claim for reimbursement of amounts paid in prior years but also the affirmative act of payment on account of another year's joint tax liability, coupled with her failure to make any claim against the estate until more than 3 years after decedent's death, is sufficient to justify the conclusion that she had waived any right to reimbursement which she may have had.[5]

Second, the rule is inapplicable where the subject matter involved is the *income*, rather than the principal, of the wife's separate property; in such case, it is presumed that a gift was intended by the wife. *Hauer's Estate*, *supra*; *Appeal of Ann McGlinsey*, *Adm'x of John McGlinsey*, 14 S. & R. 64 (Pa. 1826). The rationale of this rule is that the use of the wife's income induces the husband to expend his funds to increase the comforts of his wife as well as his own. *Hauer's Estate*, *supra*; *Appeal of Ann McGlinsey*, *Adm'x of John McGlinsey*, *supra*. Cf. *Fox* v. *Rothensies*, 115 F. 2d 42 (C.A. 3, 1940).[6] The presumption is further strengthened where the circumstances show that the wife could easily have prevented the income from being used by the husband or for his benefit. *Hauer's Estate*, *supra*.

Petitioners seek to avoid the effect of the foregoing cases, and their rationale, by arguing that they are applicable only where the wife's income is used for the necessary support of the husband or his family. Such a distinction, if it exists, is not articulated in such cases and, in any event, is inapplicable herein. In the present-day world, the payment of income taxes is a common, if not universal, obligation, and the relief of the husband from such liability is equally as effective to release his funds for increased comforts as would be the expenditure of the wife's income for food, clothing, education of children, etc. The effect of the 1968 letter must be considered minimal in light of the strong web of circumstances contradicting this belatedly asserted claim by decedent's wife. Moreover, under Pennsylvania law, a wife

---

[5] Respondent has not argued that the statute of limitations is applicable herein. Indeed, it appears that, under Pennsylvania law, the statute does not begin to run until the termination of coverture, which occurred herein upon decedent's death. *Morrish* v. *Morrish*, 262 Pa. 192, 105 Atl. 83 (1918). See also Pa. Stat. Ann., tit. 12, secs. 31 and 35, and tit. 20, secs. 320.606 and 320.616 (1950).

[6] There are indications that this rationale may also be applicable even where principal is used for the benefit of the family. See 115 F. 2d at 45.

may not, by subsequent unilateral action, convert a gift into a loan. See *Bergey's Appeal*, 60 Pa. 408, 417 (1869).

In light of the foregoing, we hold that the claim of decedent's wife for reimbursement of the amount of her payments on account of Federal income taxes of herself and decedent claimed to be attributable to the latter's income would not be valid under Pennsylvania law and that therefore no deduction with respect thereto can be allowed under section 2053. In view of our holding, we do not reach the question of whether petitioners' method of apportionment of those taxes as between decedent and his wife is proper. See Rev. Rul. 56-290, 1956-1 C.B. 445, modifying Rev. Rul. 54-382, 1954-2 C.B. 279, and clarified by Rev. Rul. 57-78, 1957-1 C.B. 300.

*Decision will be entered under Rule 50.*