ESTATE OF ANNABEL L. CADY, Deceased, ELWYN L. CADY, JR., Ancillary Administrator, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Cady v. Commissioner
Docket No. 11664-77.
United States Tax Court
T.C. Memo 1979-318; 1979 Tax Ct. Memo LEXIS 208; 38 T.C.M. (CCH) 1228; T.C.M. (RIA) 79318; August 15, 1979, Filed; As Amended Elwyn L. Cady, Jr., pro se. James T. Million, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined an estate tax deficiency of $4,397.62, and a section 6651(a) [1] addition to the tax in the amount of $219.88. Concessions having been made, the two issues for our decision are: (1) Whether the *209 transfers made by decedent Annabel L. Cady of cash within the 28 months immediately preceding her death to her only heir apparent and to his wife are includable in the decedent's gross estate as transfers in contemplation of death within the meaning of section 2035; and (2) Whether the estate is liable for the additions to the tax imposed under section 6651(a)(1). FINDINGS OF FACT Some of the facts have been stipulated and are so found. Annabel L. Cady (hereinafter decedent) died intestate on August 9, 1974, at the age of 77, while a resident of the Swope Ridge Health Care Center. The ancillary administrator of her estate, Elwyn L. Cady, Jr. (hereinafter petitioner), is decedent's son and only surviving child. He resided at 1919 Drumm Avenue, Independence, Missouri, at the time the petition herein was filed. The Federal estate tax return herein was filed with the St. Louis Internal Revenue Service District Director's office, Kansas City Branch. Prior to the year 1972, decedent had little history of gift giving in her own name. However, Elwyn Loomis Cady, decedent's husband, had made gifts which ranged in size from approximately $1,000 to $6,000 per year, commencing *210 approximately in 1956 and ending with his death on December 15, 1970. During the years 1972, 1973, and 1974, decedent made the following gifts: Date
Donee
Amount
4/27/72
E. L. Cady, Jr.
$ 3,000.00
7/18/72
Jane E. Cady (wife
of E. L. Cady, Jr.)
3,000.00
10/13/72
E. L. Cady, Jr.
5,000.00
11/23/72
E. L. Cady, Jr.
5,000.00
12/26/72
E. L. Cady, Jr.
1,400.00
5/13/73
E. L. Cady, Jr.
3,000.00
10/09/73
Jane E. Cady
3,000.00
10/11/73
E. L. Cady, Jr.
1,000.00
11/07/73
E. L. Cady, Jr.
775.85
11/15/73
E. L. Cady, Jr.
2,000.00
12/24/73
E. L. Cady, Jr.
6,224.15
12/27/73
E. L. Cady, Jr.
2,500.00
7/11/74
Jane E. Cady
3,000.00
7/11/74
E. L. Cady, Jr.
3,000.00
$41,900.00 [2]
All of the aforementioned gifts were made by checks drawn on decedent's account at the City National Bank and TrustCompany, Kansas City, Missouri.Decedent executed a document on July 18, 1972, authorizing petitioner, as her son, to sign checks on this account. This signature authority was never revoked *211 by decedent. Prior to 1972, decedent's history of hospital and institutional care was negligible; however, she was admitted to the Menorah Medical Center (hereinafter Menorah) in Kansas City, Missouri, on March 29, 1972, for treatment of a mental condition known as paranoid delusions. Decedent entered Menorah with the assistance of her son. At the time of her admission to Menorah decedent was taking medication for hypertension, leg cramps and pain. During the month preceding her admission to Menorah in March 1972, decedent had portrayed irrational fears, including the feeling that her neighbors were trying to break into her apartment. She also felt unsafe in her bathroom. On April 3, 1972, decedent was given an EEG [3] at Menorah. The results of this test disclosed an abnormal brain wave pattern indicative of an inefficient blood supply to the brain. Decedent was fearful of impending danger and was upset by the recent suicide of a distant cousin at this time. Decedent *212 was given a physical examination on March 29, 1972, by Dr. B. Milgram at Menorah. The results show apparent arteriosclerotic narrowing in an obese woman. Decedent was diagnosed as having psychotic depression. She was also becoming increasingly aware of her own physical decline. Decedent was discharged from Menorah on April 18, 1972. At that time she was taking, and continued with various medications. She then moved to the Defenders Townhouse (Defenders), a retirement center located in Kansas City, Missouri. Decedent stayed in Defenders from April 18, 1972, until May 31, 1972. She was then moved to the Swope Ridge Health Care Center, also located in Kansas City, where she remained until her death on August 9, 1974. On April 24, 1974, decedent was diagnosed as deteriorating of natural causes. During the gift-giving period in question, decedent required assistance in eating, walking, and dressing herself. Decedent was age 77 at the time of her death and the immediate cause of death was diagnosed as arteriosclerotic disease due to, or as a consequence of, Parkinson's disease. Decedent did not, and was not required to, file a Federal income tax return for the calendar year *213 1971. However, Federal income tax returns were filed for decedent for the calendar years 1972 and 1973, and for the period of January 1 through August 9, 1974. The returns showed the following: Adjusted Gross
Total Medical Period
Income
Expenses
1972
$11,150.07
$ 6,758.19
1973
10,811.60
8,630.18
Jan. 1 through
Aug. 9, 1974
3,781.00
4,869.17
$25,742.67
$20,257.54
Decedent's son was the donee of 12 of the 14 gifts here at issue. He was decedent's sold heir at the time such gifts were made. The donee of the remaining two gifts was his wife. Decedent's son decided on the amounts, dates, and donees of all 14 of the gifts in question. OPINION From April 27, 1972 through July 11, 1974, less than three years prior to her death on August 9, 1974, decedent transferred $41,900 from her checking account on 14 separate occasions to her son or to his spouse. Whether these transfers were made in contemplation of death within the meaning of section 2035 [4] depends upon the dominant motive of the decedent which we must determine on the basis of all of the facts and circumstances. United States v. Wells,283 U.S. 102 (1931); Estate of Hunt v. Commissioner,14 T.C. 1182 (1950); *214 Allen v. Trust Co.,326 U.S. 630 (1946); Estate of Ford v. Commissioner,53 T.C. 114 (1969), affd. per curiam 450 F. 2d 878 (2d Cir. 1971). A rebuttable presumption in respondent's favor exists under the statute. [5] Section 2035(b); Estate of Honickman v. Commissioner,58 T.C. 132, 135 (1972), affd. without opinion 481 F. 2d 1399 (3d Cir. 1973); Cleveland Trust Co. v. United States,421 F. 2d 475 (6th Cir. 1970). *215 Section 20.2035-1(c), Estate Tax Regs., defines some of the relevant factors to be considered in determining whether a transfer was made "in contemplation of death." These factors include any disposition of property: "(1) made with the purpose of avoiding death taxes; (2) made as a substitute for a testamentary disposition of the property; or (3) made for any other motive associated with death." Moreover, "the bodily and mental condition of the decedent and all other attendant facts and circumstances are to be scrutinized in order to determine whether or not such thought prompted the disposition." A careful review of the record in the instant case convinces us that the transfers here were a substitute for testamentary disposition, and that the thought of death was the impelling cause of the transfers. United States v. Wells,supra;Estate of Johnson v. Commissioner,10 T.C. 680 (1948). In addition to the factors included in the regulations, this Court, in Estate of Johnson v. Commissioner,supra at 688, stated that among the factors to be considered in determining the dominant motive of a decedent in making an inter *216 vivos transfer of property are: (a) The age of the decedent at the time the transfers were made; (b) the decedent's health as he knew it, at or before the time of the transfers; (c) the interval between the transfers and the decedent's death; (d) the amount of the property transferred in proportion to the amount of property retained; (e) the nature and disposition of the decedent, e.g., whether cheerful or gloomy, sanguine or morbid, optimistic or pessimistic; (f) the existence of a general testamentary scheme of which the transfers were a part; (g) the relationship of the donee or donees to the decedent, i.e., whether they were the natural objects of his bounty; (h) the existence of a long established gift-making policy on the part of decedent; (i) the existence of a desire on the part of the decedent to escape the burden of managing property by transferring the property to others; (j) the existence of a desire on the part of the decedent to vicariously enjoy the enjoyment by the donees of the property transferred; and (k) the existence of the desire by the decedent of avoiding estate taxes by means of making inter vivos transfers of property. * * * While his mother was less *217 than fully capacitated in the last years of her life, her son decided the specific dates the gifts in issue would be made and when the checks should be prepared. In fact, he kept his mother's checkbook, filled in the names of the payee, decided on the amounts and, in some instances, had his own hand over his mother's hand as he drew her signature. The transfers herein were made by the decedent, on the advice of her son, who was also her lawyer. They occurred almost simultaneously with the failing of decedent's health. The petitioner was working so closely with his mother that, in fact, he was dominating everything she was doing. Since petitioner handled his mother's financial affairs, he was in a position to have intimate knowledge concerning the assets she owned and the values thereof. Moreover, decedent's son was the only person decedent ever consulted for estate planning, and such plans attempted to take approximately 43 percent of her assets out of her gross estate at a time when her medical expenses were rising sharply because of her rapidly deteriorating health. These circumstances all strongly support the statutory presumption and respondent's determination. Davis v. Commissioner,142 F. 2d 450 (6th Cir. 1944); *218 Oliver v. Bell,103 F. 2d 760 (3d Cir. 1939); Estate of Borner v. Commissioner,25 T.C. 1263 (1950), affd. 196 F. 2d 813 (7th Cir. 1952). Petitioner's arguments to counteract the foregoing considerations are not persuasive. He argues that the gifts began in 1956, and continued while decedent's husband was alive to support the inference of a gift-giving program "within the family." But her husband's gifts cannot be "inferred" to decedent and the record shows only two prior gifts on her part. One, a deposit slip in the amount of $1,000 in 1956, and two, a note in December 1967, indicating the transfer of $6,000 worth of "E" Bonds from decedent and her husband to their son. Petitioner testified at the trial that the decedent was desirous of making the donees, "parents of her only grandchild, financially independent to the extent that they could render extraordinary attention to the youngster." No evidence was adduced to show that the decedent was particularly interested in making life easier for her grandson. In fact, from the time decedent entered Swope Health Care Center, until her death, the record indicates that she saw her grandson *219 only once despite the fact that he lived only 10 to 15 miles away. Petitioner would have us believe that at age 77 his mother saw no need to have a will. This argument on petitioner's part really proves too much. With almost half of her assets removed from her estate by the gifts here in issue her need for a will was much reduced. We must reasonably assume that decedent's lack of will ties in which her son's intention to give her estate away.We believe that the above facts show a carefully devised plan, the primary purpose of which was to reduce the gross estate below the $60,000 statutory exemption. Having considered all of the relevant facts, we hold that the transfers herein were made in contemplation of death within the meaning of section 2035. The next issue is whether the estate is liable for the addition to the tax imposed under section 6651(a)(1). Such section imposes an addition to the tax for the failure to file a return when due unless it is shown that such failure is due to reasonable cause and not due to willful neglect. We can find no support for the petitioner's contention that the addition to the tax for the late filing of the estate tax return is not *220 applicable since he miscalculated the due date of the return. The respondent's regulations state that a failure to file is due to reasonable cause where the taxpayer exercised ordinary business care and prudence and, nevertheless, was unable to file within the prescribed time. Sec. 301.6651-1(c), Income Tax Regs. Mere uninformed belief, such as petitioner's miscalculation, no matter how sincere or innocent, has been considered insufficient to constitute reasonable cause. Henningsen v. Commissioner,26 T.C. 528 (1956), affd. 243 F. 2d 954 (4th Cir. 1957); Herman v. Commissioner,32 T.C. 579 (1959), affd. 283 F. 2d 227 (8th Cir. 1960). See Beck Chemical Equipment Corp. v. Commissioner,27 T.C. 840 (1957). Accordingly, we sustain respondent's determination. Because of concessions, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.↩
2. Total gross estate, as returned, was $54,427.79, consequently these gifts constitute more than 43 percent of what the gross estate would have been.↩
3. An EEG is an electroencephalogram which is the record, obtained by means of an electroencephalograph, of the brain potentials derived from scalp electrodes. Stedman's Medical Dictionary (1972).↩
4. SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH. (a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer * * *, by trust or otherwise, in contemplation of his death. (b) Application of General Rule.--If the decedent within a period of 3 years ending with the date of his death * * * transferred an interest in property, * * * such transfer * * * shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section * * *; but no such transfer * * * made before such 3-year period shall be treated as having been made in contemplation of death. ↩
5. P.L. 94-455, sec. 2001(a)(5) (Oct. 4, 1976). The Tax Reform Act of 1976 altered this rebuttable presumption to one of a conclusive presumption.↩