ESTATE OF GUY S. SHOEMAKER, DECEASED, ARTHUR F. SHOEMAKER AND JOAN S. WILDER, EXECUTORS v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Shoemaker v. Commissioner
Docket No. 10364-82.
United States Tax Court
T.C. Memo 1984-174; 1984 Tax Ct. Memo LEXIS 497; 47 T.C.M. (CCH) 1462; T.C.M. (RIA) 84174; April 5, 1984. *497 Held: Transfer was made in contemplation of death under sec. 2035, I.R.C. 1954, as in effect for pre-1977 transfers. Alan Parsons and James Young (specially recognized), for the petitioners. Barry Finkelstein, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: The Commissioner determined a deficiency in estate tax in the amount of $10,644.58. Due to concessions by both parties, the sole issue is whether or not the value of approximately 94 acres of real property (the Gift Property) conveyed by the decedent, Guy S. Shoemaker, to his three children, Arthur F. Shoemaker, Joan S. Wilder and Patricia S. Story, in December 1976 was a gift in contemplation of death *498 and therefore includable as part of the gross estate. The value of the Gift Property, if included in the gross estate, is not in dispute. For convenience, our Findings of Fact and Opinion are combined. Some of the facts have been stipulated and they are so found. Decedent was born in December 1898 and died testate on July 10, 1978. At that time he was a resident of the State of New York. Two of his children, Mr. Shoemaker and Mrs. Wilder, qualified as executors of his estate. The two co-executors also reside in the State of New York. Decedent's residence at the time of his death was located on the east shore of Keuka Lake. Decedent's grandfather had purchased lake frontage and had constructed a home there many years earlier. That home was inherited by decedent's mother on the death of his grandparents and ultimately by decedent and his brothers and sister. It was sold in 1960. In 1925, decedent's parents purchased some additional property, including lake frontage adjoining their property (the decedent's grandparents' home). Approximately 10 acres of this newly acquired property was deeded to decedent and his wife as a gift in 1926. Decedent and his wife constructed *499 a summer residence which came to be known as Graystones. In 1941 decedent and his wife became year-round residents at Graystones, continuing to reside there until their deaths. [1] Five years later, decedent's parents conveyed additional acreage which adjoined the Graystones property on the easterly side, a portion lying east of State Highway 54. Finally, in 1951 decedent and his wife purchased approximately 90 acres, lying east of Highway 54, adjoining decedent's property. The Gift Property was composed in part of land acquired in 1946 and in part of land acquired in 1951. A portion of the Gift Property was used prior to 1960 by decedent for raising and selling turkeys. Thereafter, some income was generated by leasing space in barns for boat storage and by selling hay from the fields and leasing pastures. From about 1960 until several years prior to decedent's death, he was employed as an assessor for the town of Wayne. Decedent personally did much of the work involved in keeping of the grounds around and beach in front of Graystones, including the cutting of grass. He also cut the *500 grass, as necessary, around the buildings on the Gift Property. Decedent and his wife continued the family tradition of using their residence as a gathering place for family members, including especially a Fourth of July gathering. Following the death of decedent's wife, decedent's children undertook to continue the family gatherings, using Graystones. Although decedent's health apparently remained good until the year 1976, he was beginning to find the tasks to be a burden, especially following his wife's death. The chores also kept him physically away from his residence and from the telephone for periods of time, which he disliked. In early 1976, decedent slipped and incurred a hairline fracture in one hip which required brief hospitalization. Thereafter, he was briefly hospitalized for acute diverticulitis and for a urethral stone and an enlarged prostate, which ultimately led to surgery on account of cancer of the prostate. The surgery was followed by radiation therapy in the latter part of 1976, with recovery from the radiation therapy continuing into 1977. While petitioner was diagnosed as having made a complete recovery from cancer, he continued to be concerned about *501 the possibility of a recurrence. However, he continued to be active physically during 1976 and in 1977. In June of 1976, decedent executed a new will pursuant to which the Gift Property would have passed as part of the residuary estate equally to such of decedent's three children as survived him. All three were living and in apparent good health at that time, and all three did in fact survive him. In the fall of 1976, decedent changed attorneys and on December 14, 1976, another new will was executed which in general continued the dispositive pattern of the earlier 1976 will. Also, in June 1976 decedent employed a surveyor to prepare a boundary survey and map of the land acquired in 1951. In August 1976, this parcel of land was listed with a real estate agency for sale, but decedent's asking price was known to be greatly in excess of the fair market value of the property. The listing for sale did not represent a realistic effort on decedent's part to sell the property. Decedent's intent in causing the survey to be made and the property to be listed for sale is not explained in this record. [2] Thereafter, decedent caused the surveyor to redo the survey to include certain additional *502 acreage so that the property surveyed then included all of decedent's ownership east of the State highway, which constituted the Gift Property. The new survey was dated December 27, 1976. This survey was received by decedent subsequent to the execution of the deed conveying the Gift Property to decedent's children. Sometime during the fall of 1976, decedent became dissatisfied with the attorney who had been assisting him earlier that year (see footnote 2, supra) and resumed using the law firm which had previously represented him and is representing petitioners in these proceedings. At sometime prior to December 1976, decedent inquired of Mr. Shoemaker and Mrs. Wilder whether or not they would be interested in receiving from him the Gift Property. *503 Presumably during December 1976, but prior to Christmas day, decedent caused his attorneys to prepare a deed conveying the Gift Property to each of the three children and arranged for the deed to take place at the home to Mr. Shoemaker on December 25, 1976, during the family Christmas celebration, which Mrs. Wilder and her family attended. Neither Mrs. Story nor her family were present. Decedent also arranged for one of his attorneys, who lived near Mr. Shoemaker, to attend the execution of the deed. [3] This attorney, as notary public, acknowledged the deed which Mr. Shoemaker caused to be recorded on December 28, 1976. Commencing in 1977, the three children incurred substantial cost in maintaining the Gift Property and they sold it several years after decedent's death. *504 While the description of the property was inaccurate in some particulars and required a correction deed due to the fact that the new survey was not available to the attorneys when the deed was prepared, it is clear that the property described in the December 25, 1976, deed was intended to be the same property included in the revised survey and more correctly described in the correction deed dated February 10, 1977. Respondent argues that the deed was ineffective to transfer title to the property in 1976 because of the errors in the description and because there was no effective delivery of the Gift Property. We disagree and hold that the gift was effected for Federal estate tax purposes in 1976. [4]
Decedent's explanation of the gift to his children on that Christmas day was to the effect that his children had been very nice to him. However, on December 29, 1976, decedent wrote Mr. Shoemaker and Mrs. Wilder separate letters *505 [5] which in essence explained that the Gift Property was conveyed to them to show his appreciation for their help during the illness of decedent's wife and in the case of Mrs. Wilder for her assistance during decedent's illness. Each letter consists of two paragraphs. In the first paragraph, reference is made to the particular assistance given by each child. The remaining paragraph of each letter describes the gift. The language in the second paragraph of each letter is identical, even to abbreviations and punctuation, except for the change necessary to refer to the two sisters in one case and to the brother and the sister in the other. [6]
Each letter is formally addressed with the full name and address of the recipient, the date includes the year and the signature, "Dad," is followed by the decedent's full name. The verbiage of the last paragraph is *506 somewhat stilted, especially in the use of precise acreage figures, the reference to a "land contract" and to the survey by the name of the surveyor and the date. A copy of the letter to Mr. Shoemaker was attached to decedent's estate tax return. The letterhead is that of Graystones Farm, the trade name for the turkey farm which had been operated on the Gift Property but had long since been discontinued. The appearance of these two letters contrast sharply with a letter written to Mr. and Mrs. Shoemaker some years earlier thanking them for a 50th wedding anniversary party. This latter letter was on decedent's personal stationery, was addressed to "Dear Liz and Art" and contains a significantly different tone. Both of the December 1976 letters create the impression that they were drafted with the advice of an attorney for exactly the purposes for which used. It would not be surprising if in fact some, if not all, the verbiage was furnished to decedent by his attorneys. [7]
*507 The testimony, the documents and human experience dictate that this sequence of events--the December 1976 will, the interruption of the Christmas day festivities for a business session with one of decedent's attorneys present, the somewhat unnecessary December 29, 1976, letters (and their unusual verbiage)--point to careful estate planning orchestrated by decedent's attorneys. [8]
The purpose of section 2035[9] is "to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax." United States v. Wells,283 U.S. 102, 117 (1931). The crucial question is one of fact--whether *508 in light of all circumstances the dominant motive in making the transfer was the thought of death or a purpose normally associated with life. United States v. Wells,supra.Section 2035(b), as effective with respect to transfers made prior to January 1, 1977, created with respect to a transfer made within three years of the date of death, a presumption that the transfer was made in contemplation of death "unless shown to the contrary." Respondent's regulations define the phrase "in contemplation of death" as including a transfer "prompted by the thought of death" that is "made as a substitute for a testamentary disposition of the property." Section 20.2035-1(c), Estate Tax Regs. The ultimate question--the decedent's motive in making the transfer-- is a subjective question. Estate of Johnson v. Commissioner,10 T.C. 680, 688 (1948). We conclude on this record that the transfer here was a substitute for a testamentary disposition. In Estate of Johnson v. Commissioner,supra at 688, *509 we listed 11 different circumstances which are appropriate to consider in testing a decedent's motives. No one circumstance is determinative and these 11 factors are not exclusive. But the analysis of these factors in the light of this record, to the extent there is evidence bearing on the factors, demonstrates a strong bias in favor of holding that this transfer was made in contemplation of death. The age of the decedent, of course, weighs against petitioners and the same may be said of decedent's health. Although he had been advised that the cancer was probably cured and he considered the radiation treatments to be "insurance," he was, nevertheless, concerned about the matter and understandably so. The interval between the transfers and the decedent's death, again, is in respondent's favor but in view of the statutory presumption is of little importance. The fact that the value of the Gift Property was small in relation to decedent's total property favors petitioners. We can make no determination on this record as to the decedent's nature and disposition at the time, but both the fact that this gift fits into the decedent's long-established general testamentary scheme and *510 that the donees were natural objects of decedent's bounty favor respondent's position. Petitioners argue in this connection that the deeding of undivided interest to the three children was not identical with the testamentary scheme in that in the wills each child would have had to survive the petitioner in order to receive his or her share. We do not deem this difference to be a significant departure from the general testamentary disposition. As we found in Estate of Honickman v. Commissioner,58 T.C. 132 (1972), affd. without published opinion 481 F.2d 1399 (3rd Cir. 1973), the "transfers herein were made in the context of planning by the decedent, on the advice of his lawyer, for the disposition of his estate. * * * These circumstances strongly support the statutory presumption and respondent's determination." 58 T.C. at 135. There is nothing in this record to indicate that decedent had made prior gifts to his three children of any significance, notwithstanding the fact that decedent's parents had made several gifts of real property to decedent and his wife. See, Estate of Gerard v. Commissioner,57 T.C. 749, 760 (1972), *511 affd. per curiam 513 F.2d 1232 (2d Cir. 1975). There is certainly no evidence that decedent had a policy of making substantial gifts, again a factor favoring respondent. There is some evidence that the decedent desired to be relieved of the burden of cutting grass on this property, although petitioners have emphasized, in connection with decedent's health, that he continued to cut the grass around the Graystones residence. The meager testimony as to the possible burden of mowing grass on the Gift Property does not weigh heavily in petitioners' favor. There is no evidence that the decedent expressed any desire to derive pleasure from his children's enjoyment of this property; neither is there any reason to suspect that the children did or could have been expected to derive enjoyment from it. Keeping it was expensive and burdensome. Neither is there any evidence as to whether or not the decedent was concerned with or even knew the estate tax burden his estate could be expected to bear, although decedent's attorneys would have been derelict had they not given decedent advice on this point. Coupled with our analysis of these 11 factors is the fact that decedent's estate *512 planning attorneys must have been heavily involved in the transfer of the Gift Property and may well have devised the plan. We are forced to conclude not only that petitioners have not carried their burden of proof and rebutted the statutory presumption but the proof affirmatively warrants our conclusion that the transfer of the Gift Property was "made in contemplation of death" within the intendment of that term in the statute. By reason of the parties' concessions, Decision will be entered under Rule 155.
Footnotes
1. Decedent's wife died in January 1975 after an illness lasting approximately a year.↩
2. During this period, decedent was using one Brian Flynn as his attorney in connection with his wife's estate and for will drafting (and presumably estate planning). Mr. Flynn was not called as a witness, although it seems likely that he might have been able to shed light on decedent's intent. However, it is also likely that petitioners would have prevented such testimony on the grounds of the attorney-client privilege.↩
3. In part these facts have been inferred on the basis of the testimony and the documentary evidence. Neither Mr. Shoemaker nor Mrs. Wilder knew prior to Christmas day that the deed was to be executed using Mr. Parsons to take the acknowledgment. Mr. Parsons is one of petitioners' counsel of record for this case and was in 1976 a member of the firm of attorneys to which decedent returned for legal assistance, including will drafting, in the fall of 1976. The December 25, 1976, deed is in a printed form and is typed except for the day of the month on the front page, the day of the month and the county in the acknowledgment and, of course, the signatures of decedent and Mr. Parsons. Although not on a printed form, the correction deed, dated February 10, 1977, is otherwise similar. In the margin of the first page of each deed there is in handwriting a direction to the recording office to mail the recorded deed, in the first instance to decedent and in the second to Mr. Parsons. The handwriting on both deeds is at least superficially similar and it clearly is not decedent's since decedent printed where legibility was required. Although there is no direct evidence that Mr. Parsons or his law firm prepared both deeds at decedent's direction and that decedent arranged for Mr. Parson's presence at Mr. Shoemaker's house, the inferences we have drawn are all but required on this record. And we cannot fail to note that Mr. Parsons in his initial brief not only provides more facts as to this property transfer than we can find in the record, but confirms our assumption as to the participation by decedent's attorneys.↩
4. Sec. 2035 of the Internal Revenue Code, 1954↩, was amended in material respects by the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, effective for transfers made subsequent to Jan. 1, 1977. Thus, this case is governed by the pre-1977 law.
5. Since both letters refer also to Mrs. Story, it might logically be assumed that she, too, received a similar letter, but there is no evidence as to this. ↩
6. Each letter also has an obvious typographical error, use of "a" instead of "an" in one letter and use of the wrong last letter in the word "Urbana" in the other.↩
7. Prior to trial, respondent sought discovery of estate planning files of Mr. Parson's law firm pertaining to decedent. The attorney-client privilege was asserted and sustained by us, although we invited attention to the possibility that an unfavorable inference could be drawn from this assertion of the privilege. Having fully considered this matter in the light of the entire record and the applicable case law, we conclude that it is unclear whether these facts warranted the drawing of such an inference. Therefore, for purposes of our Findings of Fact and Opinion, we attach no significance whatsoever to this discovery issue.↩
8. We do not mean to imply any improper action on the part of the attorneys, but their active participation has an obvious bearing on the decedent's motives. As Judge Sterrett said in a recent opinion: "While obviously the true facts can never be known with complete certainty by an outsider, we find * * *. We base our conclusion upon our view of the spoken testimony and how that testimony, coupled with the documentary evidence, comports with human experience." John J. Wells, Inc. v. Commissioner,T.C. Memo. 1984-79↩, Slip Opinion at 7.
9. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as in effect for pre-1977 transfers.↩