ESTATE OF RALPH A. BALAZS, Deceased, NOVICE M. BALAZS, Executrix, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Balazs v. Commissioner
Docket No. 1994-78
United States Tax Court
T.C. Memo 1981-423; 1981 Tax Ct. Memo LEXIS 316; 42 T.C.M. (CCH) 632; T.C.M. (RIA) 81423; August 12, 1981. *316 A. Jeffrey Barash, for the petitioner. *
Thomas M. Cryan, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR Judge: Respondent determined a deficiency in petitioner's Federal estate tax of $ 74,617. The sole issue presented here for our decision is whether the petitioner is entitled to exclude from the gross estate any portion of the value of certain assets held jointly by the decedent and his wife. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Ralph A. Balazs (hereinafter referred to as Ralph or the decedent) died on July 9, 1974. A Federal estate tax return was filed with the Internal Revenue Service at Jacksonville, Florida. Decedent's wife, Novice M. Balazs (hereinafter referred to as Novice) is the executrix of the estate and resided in Lighthouse Point, Florida at the time this suit was commenced. Ralph and Novice were married on September 29, 1959. This was not the first marriage for either party. Novice had received *317 a divorce from her former husband in 1956. She had three children: Priscilla, Sterling and Bonny. Ralph was a widower with no children. Prior to this marriage, Ralph owned one-half of the stock of Engineered Trusses, Inc., (hereinafter referred to as Engineered Trusses). He was employed by that company and paid a substantial salary. He was the part owner of a small piece of land on which the Engineered Trusses plant was located. Decedent's other real estate holdings included a farm in Maryland which was rented out and a farm in North Carolina which was sold in 1967 for a substantial sum of money, and other real properties in an unknown amount. In addition, Ralph received income from his 50 percent interest in the Balazs and Reynolds partnership and from Balisco Corporation (commissions and dividends). Notice's premarital property consisted in the main of family business ventures. She owned a one-third interest along with her two brothers in the McClellan's Firestone Dealer Store, Inc. (hereinafter referred to as the McClelland's Firestone), which included several properties adjacent to the store. She worked full-time in the store as a salesperson, drawing the same salary *318 as her brothers. She owned a new car and a home, both unencumbered. Shortly before their marriage, Novice went to her bank and closed her accounts. With the money she opened new accounts, title being taken jointly in the names of Novice and Ralph. No evidence was presented at trial as to the amounts in these accounts. In addition to their separate estates which they brought into their marriage, Novice and Ralph each received substantial sums subsequent thereto. Examining Novice's sources of funds first, we find that the majority of her receipts were at irregular intervals. She continued to work for McClellan's Firestone Store through 1961, earning $ 7,831.97 in 1959, $ 5,934.30 in 1960, and $ 3,250 in 1961. During 1964, Novice sold her interest in McClellan's Firestone Store to her brothers in exchange for $ 9,300 worth of stock in trade and a $ 7,000 installment note which was paid off in full as of February 28, 1969. Utilizing the stock in trade she received, Novice opened the Heritage Room Gift Shop. This venture resulted in losses of $ 3,411.26 and $ 4,517.37 for the years 1964 and 1965, respectively. On or about January 1, 1962, Novice, together with her two brothers, *319 formed a partnership known as McClellan's Real Estate. The partnership holdings included several large tracts of real estate, the sales of which provided the primary source of funds for distribution to Novice from the partnership. The distributions which were substantiated are as follows: Year
Date
Amount
Total
1963
November 30
$ 98.00
$ 98.00
1964
May 9
100.00
100.00
1967
Unspecified
20,000.00
20,000.00
1970
April 6
250.00
250.00
1971
September 8
1,000.00
December 15
3,333.00
4,333.00
1972
April 4
1,666.66
May 18
90,000.00
May 31
42,399.96
September 20
366.93
Unspecified
24,990.45
159,424.00
1973
April 6
1,000.00
May 7
1,000.00
June 6
1,000.00
August 8
1,000.00
September 11
1,000.00
October 23
81,736.71
Unspecified
1,000.29
87,737.00
1974
Unspecified
20,528.00
20,528.00
$ 292,470.00
In addition, the partnership generated varying amounts of income and losses, Novice's distributive share being as follows: Taxable Year
Income (Loss)
a *320 1962
b 181.48 1963
(431.08)
1964
(184.00)
1965
(46.57)
1966
(265.00)
1967
(305.49)
1968
(484.35)
1969
682.79 1970
(1,152.00)
1971
219.00 Long-term capital gain
7,829.00 1972
(1,526.00)
Long-term capital gain
150,919.00 1973
88.00 Long-term capital gain
83,526.00 1974
(361.00)
Novice and Ralph never made any contributions to the partnership out of any of their joint bank accounts. In 1973 Novice sold the home she had acquired from her former husband for a gain of $ 940. Sixty-four thousand dollars was realized on the sale. The gain was not recognized since the proceeds were invested in a new personal residence costing $ 64,421. Ralph's chief sources of income during these years were his salary from Engineered Trusses, income from the Balazs and Reynolds partnership, rental of a farm in Maryland and commissions from the Balisco Corporation. For the years 1959 through 1969, Ralph's income is shown as follows: Chart A Salary from
Balazs and
Commissions and
Taxable
Engineered
Reynolds
Director's fees
Year
Trusses
Partnership
from Balisco Corp.
1959
$ 20,582.00
$ 1,752.27 1960
26,274.00
2,449.15 1961
16,694.00
2,906.52
$ 1,440.00
1962
18,870.00
3,189.00 1,440.00
1963
12,194.00
3.191.00 1,440.00
1964
12,428.50
3,184.00 1965
6,328.00
1,428.71 2,135.00
1966
6,760.00
(333.04)
1,740.00
1967
6,760.00
(337.63)
1968
17,200.00
1969
Totals
$ 144,090.50
$ 17,429.98 $ 8,195.00
*321 Long-Term
Taxable
Maryland Farm
Interest
Capital Gains
Year
Rental a
Income
(Losses)
Totals
1959
$ 469.00 $ 22,803.27 1960
327.54 29,050.69 1961
(143.87)
20,896.65 1962
( 60.00)
23,439.00
1963
(361.64)
16,463.36
1964
(586.00)
15,026.50
1965
(742.46)
9,149.25
1966
521.50 8,688.46 1967
217.00 $ 352.57
b $ 25,367.00 32,358.94 1968
134.00
c 34,075.00 51,409.00 1969
d (1,674.00)
(1,674.00)
Totals
($ 358.93)
$ 486.57
$ 57,768.00 $ 227,611.12 a Net rental income after expenses but before depreciation. b From the sale of Maryland farm. The amount realized on this sale was $ 96.900. c From the sale of 2,725 shares of stock in Engineered Trusses. The amount realized on this sale was $ 65,740. d From the sale of a cottage in Maryland. The amount realized on this sale was $ 11,550. During the course of their marriage, Ralph and Novice maintained several joint bank accounts and had on occasion purchased properties for investment (including real estate and securities) in their joint names. The income produced by their jointly owned assets is set forth below: Chart B Interest on Joint
Capital Gains from
Taxable
Pompano Gulf
Savings and Loan
Sale of Jointly
Year
Service
Accounts
Held Property
1960
($ 7,181.91)
1961
( 335.13)
a *322 a $ 2,025.51
1962
a 2,882.00
1963
a 2.843.00
1964
a 2,968.00
1965
a 3,512.04
1966
850.60
1967
1,496.61
1968
790.00
1969
2,546.00
b $ 7,712.00
1970
6,338.19
c 6,377.00
1971
2,934.00
d 1,914.00
1972
4,591.00
e 3,416.00
1973
8,052.00
f (3,087.00)
1974
5,432.00
Totals
($ 7,517.04)
$ 47,260.95
$ 16,332.00 Year
Dividends
Antique Store
Totals
1960
($ 7,181.91)
1961
1,690.48 1962
2,882.00 1963
g $ 194.00
3,037.00 1964
g 2,135.00
5,103.00 1965
3,512.04 1966
h 5,872.83
6,723.43 1967
1,496.61 1968
790.00 1969
10,258.00 1970
235.00
12,950.19 1971
592.00
($ 777.00)
4,663.00 1972
1,525,00
9,532.00 1973
1,873.00
6,838.00 1974
2,412.00
7,844.00 Totals
$ 14,838.83
($ 777.00)
$ 70,137.84  During the years 1963 through 1965, $ 4,433.27 was reported as rental income, before depreciation but *323 after expenses, from the Engineered Trusses warehouse. During the years 1970 through 1972, the rental income from the warehouse was $ 9,075. Rental of the other Engineered Trusses property generated income of $ 143,621 for the 5-year period 1969-1974. There is no evidence as to whether the warehouse or other properties were owned by Ralph alone or by Novice and Ralph jointly. On the Federal estate tax return, petitioner listed on Schedule E various assets owned jointly by Ralph and Novice as of the date of his death. The alternative valuation date was elected. The petitioner excluded from the gross estate amounts deemed by it to be attributable to consideration furnished by Novice for the purchase of the respective asset. Respondent in his notice of deficiency determined that Novice had not provided any consideration for the purchase of any of the jointly held properties. The following is a listing of those properties, corresponding to their ordering on the estate tax return, together with the relevant details: JOINTLY HELD REAL PROPERTY Amount claimed
as attributable
Parcel
Alternate
to co-tenant's
Number
Description
valuation
contribution
S. Side of N.E. 16th St. West
of Dixie Hgwy,
1
Pompano Beach, Fla.
$ 56,437
$ 28,218
2
Dixie Hgwy. & N.E. 16th St.
Pompano Beach, Fla.
181,126
72,144
3
1621 N. Dixie Hgwy., Pompano
Beach, Fla.
28,843
14,421
4
2511 N.E. 36th St.,
Lighthouse Point, Fla.
64,000
64,000
5
Apt. 233, Tarleton Terrace
Coop., Lighthouse Point, Fla.
20,000
10,000
6
Lot 15, Blk. 20, less West 5
ft., Hillsboro Iles, Fla.
35,000
35,000
7
4190 N. Federal Hgwy.,
Lighthouse Point, Fla.
125,000
125,000
8
North Carolina Parcel No. 1
45,000
22,500
9
North Carolina Parcel No. 2
45,000
22,500
10
North Carolina Parcel No. 3
5,000
2,500
11
Maryland Property--Not in
issue herein
30,000
JOINTLY HELD STOCKS AND BONDS
$ 71,017
$ 35,508
JOINTLY-OWNED BANK ACCOUNTS
$ 101,878
$ 50,939
*324 Amount determined
Amount included
by respondent
Parcel
in gross estate
includable in
Adjustment
Number
Description
per return
gross estate
(Increase)
S. Side of N.E.
16th St. West of
Dixie Hgwy,
1
Pompano Beach, Fla.
$ 28,219
$ 56,437
$ 28,218
2
Dixie Hgwy. & N.E.
16th St. Pompano
Beach, Fla.
108,982
181,126
72,144
3
1621 N. Dixie
Hgwy., Pompano
Beach, Fla.
14,422
28,843
14,421
4 2511 N.E. 36th
St., Lighthouse
Point, Fla.
64,000
64,000
5
Apt. 233, Tarleton
Terrace Coop.,
Lighthouse Point, Fla.
10,000
20,000
10,000
6
Lot 15, Blk. 20,
less West 5 ft.,
Hillsboro Iles, Fla.
35,000
35,000
7
4190 N. Federal
Hgwy., Lighthouse
Point, Fla.
125,000
125,000
8
North Carolina
Parcel No. 1
22,500
45,000
22,500
9
North Carolina
Parcel No. 2
22,500
45,000
22,500
10
North Carolina
Parcel No. 3
2,500
5,000
2,500
11
Maryland
Property--Not in
issue herein
30,000
30,000
$ 35,509
$ 71,017
$ 35,508
$ 50,939
$ 101,878
$ 50,939
$ 482,730
The typical method of purchasing real estate was for the couple to make a down payment and then carry the mortgage for a short period of time after which the purchase price was paid off in full. They always took title jointly. Novice made all of the mortgage payments. The payments were generally made from their joint bank accounts. Parcel No. 1 was purchased *325 on May 13, 1968 for $ 28,000. A purchase and sales agreement had previously been entered into on February 13, 1968, at which time a cash deposit of $ 2,800 was made. At the May 13 closing an additional $ 5,200 was paid. The balance of $ 20,000 was financed by means of an installment note which was secured by a first mortgage signed by both Ralph and Novice. Monthly payments of $ 391.33 were made on the note from June 12, 1968 until October 4, 1969. The remaining balance on the note of $ 14,924.85 was paid off in full on November 20, 1969. With the single exception of the May 13, 1968 payment of $ 5,200, the parties have stipulated that all of the payments with respect to the acquisition of this property were made by means of checks drawn upon a joint checking account in the names of Novice and Ralph. Novice's signature appears on the checks. Parcel No. 2 was originally subdivided into seven separate units. Three of these units were purchased by the decedent for an unknown price prior to his marriage to Novice. The four remaining units were purchased jointly by Novice and Ralph during the course of their marriage. One of the seven units of Parcel No. 2 was the "Queens Systems," *326 purchased on January 26, 1962 for $ 16,000. Payment of the purchase price was accomplished by the assumption of a first mortgage in the amount of $ 6,882.61, the giving of a second mortgage in the amount of $ 4,500 executed by both Novice and Ralph, and a cash payment of $ 4,617.39. The first mortgage provided for monthly payments of $ 100 over an unknown period. This mortgage was eventually satisfied. The second mortgage required monthly payments of $ 136.00 and was satisfied in full as of April 30, 1965. The "Trucks Parcel," also one of the seven units of Parcel No. 2, was acquired on May 12, 1964 for $ 12,000. The purchase price was paid by means of a $ 6,000 cash payment and the giving of a first mortgage in the amount of $ 6,000, said mortgage being executed by both Notice and Ralph. Monthly payments of $ 182.54 over a 3-year period were required. This mortgage was satisfied in full as of May 8, 1967. The "Pure Oil Parcel," another of the seven original parcels, was purchased on April 24, 1968 for $ 16,000. The "Reynolds Property," the last of these seven parcels, was purchased on April 23, 1968. The documentation regarding the purchase price of the latter parcel and *327 the method of payment of both parcels was unavailable at the time of trial. Parcel No. 3 was purchased on or about February 24, 1969 for $ 14,500. The documentation concerning the method of payment of the purchase price is unavailable. Parcel No. 4 was the couple's personal residence. It was purchased by them on March 5, 1973 for $ 64,000. It was purchased contemporaneously with the sale of their prior home and from resources made available from that sale. Their prior home had been acquired by Novice during 1956 as part of her divorce settlement. After Novice's marriage to Ralph he moved into her home, although title remained in Novice's name alone. Maintenance and repairs, including the installation of a swimming pool, were paid for out of the couple's joint bank accounts. Two adjoining vacant lots were purchased jointly by Ralph and Novice from Novice's mother for $ 6,000 on February 28, 1969. A contract was entered into on February 6, 1973 to sell the house for $ 64,000. A $ 1,000 deposit was to be paid on that date, with $ 4,500 due at closing, and subject to the purchaser's ability to obtain a first mortgage in the amount of $ 58,500. This sale was eventually consummated *328 on April 11, 1973. After deducting the various expenses of sale, it generated cash in the amount of $ 58,676.72. Also on April 11, 1973, the vacant lots adjoining the home were sold for cash in the amount of $ 5,456.61. Parcel No. 5 was purchased on or about March 31, 1972 for $ 16,300. A deposit of $ 1,630 was paid on February 25, 1972 and the balance was paid in cash at the time of closing. Parcel No. 6 was purchased on May 5, 1972 for $ 37,000. Parcel No. 7 was purchased on February 1, 1974 for $ 133,000. Also, Parcel Nos. 8 and 9 (North Carolina parcels 1 and 2) were purchased for $ 17,100 and $ 17,500 on September 17, 1970 and June 28, 1967, respectively. Again, the documentation concerning the method of payment of these parcels was unavailable to the parties at the time of trial. Parcel No. 10 (North CarolinaParcel No. 3) was purchased on or about April 1, 1968 for $ 2,250. A $ 225 down payment was made on March 22, 1968 and the remaining balance of $ 2,025 was paid in cash at the time of closing. Novice and Ralph purchased stocks and bonds and held them in their joint names with right of survivorship. Those securities which were included in the gross estate are listed *329 below showing the date of acquisition and their cost: Date of
Purchase
Description
Purchase
Price
$ 5,000 City of Winter Garden 6%
Utility
6/15/72
$ 5,374.00
Rev. Service due 9/1/87
Accrued interest
$ 5,000 Kansas City Special Facility
Airport
11/18/71
5,100.00
Rev. Bond 7.2% due 5/1/85
Accrued interest
$ 5,000 Harris Co. Water Control
District
4/5/71
5,443.04
#119 Revenue Bonds 8% due 3/1/94
Accrued interest
$ 10,000 Dade Co. Port Authority
Revenue
1/6/71
10,684.67
Bond, Series B 8% due 1/1/80
Accrued interest
$ 5,000 Dade Co. Port Authority Sp. Rev.
4/28/71
5,135.21
Bond 7 3/8% due 1/1/93
Accrued interest
$ 5,000 Dade Co. Port Authority Sp.
Rev.
10/4/73
5,995.99
Bonds Series B 8 5/8% due 1/1/90
Accrued interest
$ 10,000 Monroe Co. Bridge Rev. Bonds
6/14/72
8,275.69
5 3/4% due 9/1/97
Accrued interest
$ 5,000 City of Winter Garden Utility
6/15/72
5,358.00
Rev. Bond Series 1971 6% due 9/1/88
Accrued interest
100 sh. Florida Steel
2/16/72
3,350.50
200 sh. Curtis Wright
3/9/72
5,356.48
200 sh. American Realty Trust
12/13/71
1,746.00
500 sh. Arlen Property Investors
10/6/71
8,382.50
200 sh. Carolina Power & Light
11/6/73
4,152.74
100 sh. John Hancock Investors
1/14/71
2,500.00
200 sh. Land Mark Banking
6/10/71
$ 3,237.50
8 sh. Narda Microwave
Unknown
Unknown
400 sh. Pennzoil Offshore
3/29/71
4,057.76
400 sh. Southern Co.
11/28/73
5,950.00
200 sh. United Aircraft
12/19/73
5,469.73
200 sh. U.S. Leasing Real Estate
12/17/70
5,000.00
*330 For purposes of the Federal estate tax return, petitioner deemed exactly one-half of the aggregate fair market value of these stocks and bonds as of the alternative valuation date to be excludable from the gross estate as being attributable to the wife's contributions. The respondent disagreed and required the entire alternative valuation to be included. The only documentary evidence presented at trial concerning the method of purchase of these items was a check for $ 10,000 signed by Novice and drawn on their joint checking account payable to a stock brokerage firm. Novice and Ralph maintained six savings accounts and two checking accounts in their joint names with the right of survivorship as of the date of Ralph's death. These accounts were included in the gross estate at value as of the alternative valuation date; however, one-half of the aggregate value of these accounts was excluded from the gross estate as being attributable to contributions by the surviving cotenant. The respondent determined in his notice of deficiency that no exclusion was allowable. The identification of these accounts is as follows: Bank
Account Number [1]
Southern Federal Savings
1006298-2
& Loan
Atlantic Federal Savings
6-2293-3
& Loan
First Federal Savings & Loan
15051-6-9
of Broward
161012-1
40988-8
50316-9
Pompano
Checking Acct.
North Carolina
Checking Acct.
*331 Novice received significant income during the years of the marriage, including particularly large cash distributions from the McClellan Real Estate partnership beginning in the early 1970's. Novice opened the original joint accounts using funds of her own and major portions of the substantial sums she received during the marriage were deposited in the joint accounts. Some of these funds were used for down payments on real property acquired, and to amortize or liquidate mortgages on which the parties were jointly liable. At the date of Ralph's death at least the funds in the joint bank account were originally Novice's funds. Novice on occasion would help her husband in his business. For example, she would take over the bookkeeping functions when the full-time secretary was absent from the office, she went *332 to home shows, and as the vice-president and a member of the board of directors she attended most of the shareholders' and directors' meetings. When the company sought to obtain bank loans, Novice would sometimes co-sign the notes as a joint obligor or guarantor. At one point when Engineered Trusses had used up its line of credit with the banks, Novice and Ralph loaned the company the money it needed to conduct its operations. These funds were generally advanced from their joint bank accounts (including a loan for $ 12,000 on August 6, 1968), although at least once the money came from Novice's personal account. Finally, Novice and Ralph jointly acquired several parcels of land surrounding the company's plant, and leased them to the company. As previously stated, respondent in his statutory notice of deficiency disallowed any exclusions from the value of the property owned jointly by the decedent and his wife on account of his wife's contributions to the acquisition of the properties. Additionally, petitioner failed to report on its Federal estate tax return 200 shares of Banister Contingental stock which had been purchased by January 21, 1971 for $ 2,175.26 and which remained *333 in their joint names on the date of decedent's death. This stock had a fair market value of $ 875 as of the alternative valuation date (January 9, 1975). The parties have agreed that petitioner is entitled to additional deductions for expenses of administration. OPINION Decedent and his wife jointly acquired considerable assets during the course of their marriage. Some of these assets were still owned by them on the date of decedent's death. On its Federal estate tax return, petitioner excluded from gross estate a portion of the value of these assets as attributable to contributions to their purchase made by the wife. Respondent disallowed the claimed exclusions on the ground that the petitioner was unable to prove that the wife had made any contribution to the acquisition of the properties. Under the general rule of section 2033, the value of the gross estate includes the value of all property owned by the decedent at the time of his death, but only to the extent of the decedent's interest therein. Section 2040, [2] *335 however, provides a special rule of inclusion where the interest is held in a joint tenancy or tenancy by the entirety. In such a case, the value of the entire property *334 is included in the estate of the first joint tenant to die, except to the extent that the surviving tenant can show that he or she has contributed to the cost of the acquisition of the property. Thus a presumption is created by the statute that the deceased co-tenant was responsible for the entire cost of acquisition, and the burden of proof is placed on the estate to rebut this presumption by shwing that some portion of the consideration used to acquire the property originated with the surviving co-tenant. Foster v. Commissioner, 90 F.2d 486, 488 (9th Cir. 1937), affd. per curiam 303 U.S. 618 (1938), reh. denied 303 U.S. 667 (1938), affg. a Memorandum Opinion of this Court. *336 The record is far from satisfactory, and this is understandable in view of the number of years involved, and the commingling of income and assets by a happily married couple.There are formidable difficulties of tracing with precision the flow of assets and income of a couple who were both engaged in successful independent investments and business ventures and who also cooperated extensively in common investment and business enterprises. In view of the unsatisfactory state of the record, it is incumbent on us to do the best we can with the material at hand, bearing in mind petitioner's burden of proof. Cf. Estate of Harris v. Commissioner, T.C. Momo. 1964-109. On the basis of the entire record before us, including but not limited to inferences from the documentary evidence before us corroborated by the testimony of Novice; the sources of income and assets and flow of funds we have documented in chart form in our findings of fact; and the testimony of Novice, whom we found to be a candid, forthright, and honest witness, we have decided: (1) petitioner is sustained as to the joint bank accounts; (2) we sustain the petitioner with respect to Parcels 1, 2 (Trucks and Pure Oil Parcels *337 only), 4, 5, and 10, and the respondent as to the remaining Parcels; and (3) we sustain the respondent as to the jointly held stocks and bonds. Joint Bank Accounts
There are admittedly some problems in determining whose funds the joint bank accounts contained. In some specific instances, there is a fair amount of certainty as to which spouse was responsible for deposits made into the accounts. For example, $ 5,872.93 deposited into the First Federal Savings & Loan of Boward account no. 15051-6-9 on February 6, 1966 corresponds in amount exactly to the liquidation distribution Ralph received from Balisco Corporation during 1966. On the other hand, sometimes the deposits were divided among several accounts so as not to exceed the maximum insurable limit. Thus following Novice's receipt of $ 90,000 distribution from McClellan's Real Estate on May 18, 1972, we find deposits totalling $ 59,000 being placed into five joint savings accounts on May 24, 1972. We feel that these evidentary gaps are overcome, however, by Novice's testimony concerning the financial customs of her family. We note that the original joint accounts were established by Novice with her own money at marriage. She *338 stated that it was the practice of her husband and herself to deposit all of their receipts either into a joint checking account or a joint savings account. When the balance in a particular checking account became too high in consideration of the fact that interest was not payable on checking account deposits, the excess funds would be transferred into a joint savings account. When funds were needed to purchase a particular asset, money would be withdrawn from the joint savings account and deposited into the joint checking account so that a check could be written to purchase the asset. Furthermore, whenever monies were received from their jointly held properties, these funds would also be deposited into one of the joint accounts. Despite some minor inconsistencies in other matters, we find Novice's testimony in this regard very forthright and convincing, supported in part by the documentary evidence presented.Respondent does not really challenge this account of their financial dealings. Real Estate
As to several parcels, petitioners have made a strong case. As indicated, Novice testified that the usual method of acquisition was to make a down payment from joint funds and jointly *339 execute a mortgage that was amortized and/or liquidated out of payments derived from the resources of joint accounts. Parcel No. 1. is typical. The purchase price of $ 28,000 was paid by two payments totalling $ 8,000 and a note and mortgage in the names of both Ralph and Novice for $ 20,000. Monthly payments were made until October 1968 when the entire note was paid off. The parties have stipulated that all of the payments--other than part of the down payment--were made from funds drawn from the joint checking account; and it is clear from the record as a whole that the down payment was from joint funds. We believe that of the units involved in parcel No. 2, the "Trucks Parcel" and the Pure Oil Parcel fall into the same category, as does parcel Nos. 5 and 10. We sustain the petitioner as to these items. As to the remaining units of Parcel No. 2, Parcel No. 3, and Parcels Nos. 6, 7, 8, and 9, the documentation concerning the method of payment was unavailable at the time of trial and there is simply an absence of any significant evidence other than general assertions by Novice. We are aware of the burden taxpayers face and sympathetic to the problems presented, but we believe *340 something more is required to find for the taxpayer as to these Parcels. Parcel No. 4, however, stands on a different footing. Petitioner contends that Novice was the sole source of consideration for the acquisition of Parcel No. 4, the couple's personal residence. This home was acquired on March 5, 1973 for $ 64,000. Their prior hme had been acquired by Novice during 1956 as part of a divorce settlement with her former husband. At all times following that date, title to the house remained in Novice alone. This property was expanded by the purchase of two adjoining vacant lots during 1969. Although the sale of this house was not consummated until April 11, 1973, we think it significant that a contract for its sale was entered into on February 6, 1973. The selling price was $ 64,000--precisely the cost of their new home. Thus it was known to the parties on March 5 that a substantial sum would be forthcoming should the February 6 contract be carried out. Furthermore, the actual cash ultimately generated on the sale, including $ 5,456.61 received for the sale, also on April 11, of the vacant lots was $ 64,133.33. Thus ample funds were in fact generated by the sale. We believe, *341 given the normal manner of their real estate dealings, the Balazs's contemplated that Novice's sale of her home generated the funds over a period of time sufficient to satisfy the purchase price of their new home It is of no consequence that the funds actually used to acquire the home may have initially come from the joint accounts pending replacement with the proceeds of the sale, as we find the two transactions to have been mutually dependent and the funds from the sale to have been ultimately used for the acquisition of the new residence. Hence it follows that Novice was responsible for the entire cost of acquisition with the exception of the amount contributed by her husband towards improvements to the home following their marriage. Therefore the value of pracel No. 4 is includable in the gross estate only to the extent of the actual expenditures by Ralph for the improvements, there having been no showing that the improvements themselves had appreciated in value prior to the date of death. Estate of Peters v. Commissioner, 46 T.C. 407 (1966), affd. 386 F.2d 404 (4th Cir. 1967). Jointly Held Stoks and Bonds
As to the jointly held stocks and bonds, petitioner submitted virtually *342 no documentary evidence of any kind. Unlike the real estate acquired, she did not co-sign any notes that were periodically paid or finally liquidated from their joint accounts. While the evidence as to the real estate and joint bank accounts is fragmentary and contains gaps, it provides a fabric sewn together by specific testimony of Novice. Here the record contains little more than bare assertions by petitioner that half of the funds for the purchase of the securities were her own. We are simply unable to say on the record before us whether the securities were purchased by Ralph with his separate assets, by Novice with her separate funds, or by both together with joint funds. Recognizing the practical difficulties the statute imposes on happily married couples who quite naturally collect the economic fruits of their partnership in joint assets, we have traveled considerable ground in forming favorable inferences with respect to the real estate and joint bank accounts. On this record, it is simply not possible to do the same with regard to the securities. While on a different record we might reach a different result, here we know little more than that the securities (or some *343 unknown portion of them) may have been purchased by either spouse, or by both spouses together. This is insufficient and as to these items we sustain respondent. Income of Each Spouse
As indicated, the evidence with regard to some of the items on which we sustain petitioner is fragmentary. [3] *344 Nevertheless an analysis of the respective earnings of Ralph and Novice is consistent with our conclusions. During the years 1959 through 1969, Ralph's activities generated approximately $ 344,033.12. [4] *345 Although he had separate assets prior to his marriage to Novice, most if not all of these were converted into cash or other property prior to his death and are thus included in the total. Ralph alone accounted for none of the family's receipts after 1969. Yet the total cost of all of the jointly held assets in question here was $ 489,144.66, [5] or $ 125,111.54 more than is traceable to Ralph alone, [6] and $ 367,969.81 of this amount was expended after 1969. By contrast, Novice's cash flow reflected large increases after Ralph's ceased. As of 1969, Novice had collected only $ 45,585.64. Purchases up until this time amounted to $ 101,174.85. However, Novice could have provided one-half of the consideration because their jointly held properties had yielded $ 40,127.25 through that date. After 1969, when the bulk of the properties were purchased, both Novice's income and their joint income increased dramatically. During this latter period, Novice collected *346 $ 336,272 [7] and jointly they collected at least $ 52,085.19. [8] Therefore, it is much more likely that Novice was the main source of funds for a substantial portion of their acquisitions. Finally, Novice had generated greater funds during the marriage ($ 381,857.64) than did her husband ($ 344,033.12). If one combines Novice's separate earnings and her one-half share of the couple's joint earnings, it is clear that Novice had the resources to supply far more than half of the consideration for all of the jointly held property that we have given her credit for. Our conclusion is also bolstered by the fact that Novice was of aid to her husband in his business. She not only performed sales work, she was also an officer and director of the concern. She additionally provided financial assistance at *347 a time when it appeared that the business might be in trouble and was in fact unable to garner sufficient bank loans to finance its operations. Thus to some degree at least she was responsible not only for her own contributions to the property but those of her husband as well. [9] *348 Respondent urges that even if Novice had sufficient funds to have made a contribution, she has not shown that she did not spend these funds instead on the family's living expenses, which he claims will not suffice as consideration since it would be unrelated to the cost of acquiring jointly-owned property. Fox v. Rothensies, 115 F.2d 42 (3d Cir. 1940). Respondent fails to see that this argument actually cuts against his own contentions. If during the years prior to 1970 the family had lived solely on the earnings of the wife, they would have had to live on $ 4,548.76 per year. Even if we add to this the money generated by their jointly held property, they would have had available only $ 8,561.49 each year. Their cash would have been spread very thin when one takes into account the fact that there were three children to support. It seems that Ralph must have used at least some of his money to support the family, thus reducing even further the amount he could have expended on the properties here in question. Thus the fact that Novice's earnings began to bloom only after her husband's earnings had trailed off is a further *349 indication of the lack of consistency in respondent's complete disallowance of any contribution claimed on behalf of Novice. Decision will be entered under Rule 155. Footnotes
*. Sidney Wasserman was the original counsel of record for the petitioner. Mr. Wasserman died prior to the trial of this case.↩
a. On their 1962 joint Federal income tax return, Novice reported a loss↩ of $ 544. The parties have stipulated, however, that $ 181.48 of income was correct. b. On their 1963 joint Federal income tax return, Novice claimed a loss of $ 1,293. The parties have stipulated the correct loss to be $ 431.08. Apparently, Novice failed to take only her share of partnership losses ($ 431.08 X 3 = $ 1,293.24).↩
a. Includes interest on loans made to Engineered Trusses, evidence at trial having shown that these loans were made from the Balazs' joint bank accounts. b. From the sale of two houses in North Carolina. combined amount realized on these sales was $ 54,000. ↩
c. From the sale of a house in North Carolina and a lot in Pompano Beach, Fla. The combined amount realized on these sales was $ 43,000. ↩
d. From sales of stock. The combined amount realized on these sales was $ 29,567. ↩
e. Losses from stock sales amounted to $ 5,181. The combined amount realized on these sales was $ 22,241. There was also an $ 8,597 gain from the involuntary conversion of a warehouse. Sixty-seven thousand dollars was realized on the involuntary conversion. ↩
f. From the sale of a single lot, the amount realized on the sale being $ 6,000. ↩
g. Dividends from Balisco Corporation. These dividends were reported on the Federal income tax returns as attributable to jointly held assets, and we ignore a joint exhibit which lists them as income of Ralph alone. ↩
h. Distribution in liquidation from Balisco Corporation. See footnote g, supra↩.
1. The parties have stipulated that these accounts were in the joint names of Novice and Ralph Balazs, and that any other names appearing on the passbooks is the result of actions taken by Novice after Ralph's death. Due to this stipulation, we will ignore indications on the face of some of the passbooks that the funds contained therein were held in trust for Novice's children.↩
2. All section references are to the Internal Revenue Code of 1954, as in effect for the years here in issue, unless otherwise indicated. Section 2040 (now section 2040(a)) provides: SEC. 2040. JOINT INTERESTS. The value of the gross estate shall include the value of all property to the extent of the interest therein held as joint tenants by the decedent and any other person, or as tenants by the entirety by the decedent nd spouse, or deposited, with any person carrying on the banking business, in their joint names and payable to either or the survivor, except such part thereof as may be shown to have originally belonged to such other person and never to have been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth: Provided, That where such property or any part thereof, or part of the consideration with which such property was acquired, is shown to have been at any time acquired by such other person from the decedent for less than an adequate and full consideration in money or money's worth, there shall be excepted only such part of the value of such property as is proportionate to the consideration furnished by such other person: Provided further↩, That where any property has been acquired by gift, bequest, devise, or inheritance, as a tenancy by the entirety by the decedent and spouse, then to the extent of one-half of the value thereof, or, where so acquired by the decedent and any other person as joint tenants and their interests are not otherwise specified or fixed by law, then to the extent of the value of a fractional part to be determined by dividing the value of the property by the number of joint tenants.
3. This approach we have taken is not novel to this Court in the joint tenancy area. Estate of Carpousis v. Commissioner, T.C. Memo. 1974-258; Estate of Bender v. Commissioner, a Memorandum Opinion of this Court dated April 23, 1947; accord, Estate ofHarris v. Commissioner, T.C. Memo. 1964-109. Most of the cases denying an exclusion appear to be situations where there was a total failure of evidence as to any contribution by the surviving co-tenant, see, for example, Estate of Richards v. Commissioner, 20 T.C. 904 (1953) affd. per curiam 221 F.2d 808 (9th Cir. 1955); Estate of Blood v. Commissioner, 22 B.T.A. 1000 (1931). Many commentators have noted the inequity where the multitude of transactions as well as the period of time which has elapsed may make exacting proof through tracing an impossible task. See, Stephens, Maxfield & Lind, Federal Estate and Gift Taxation, par. 4.12 [8], p. 4-246 (4th ed. 1978); Riecker, "Joint Tenancy: The Estate Lawyer's Continuing Burden," 64 Mich. L. Rev. 801, 811↩ (1966). For a look by a former head of the IRS Estate and Gift Tax unit at the inconsistent treatment and often ironic results occasioned by the statutory scheme, see Fisher, "Uncle Sam, the Indian Giver: More 'Human Drama in Death and Taxes'", 107 Trusts and Estates, 529 (1968). 4. This figure differs from the total appearing on Chart A since we have substituted the amount realized for the long-term capital gains, the former being a more accurate reflection of the proceeds generated by the sale available for reinvestment. This is particularly true here where the property sold was primarily premarital property. 5. This figure, and all others used herein to describe the costs of the various properties, do not reflect the cost of the Reynolds Property (part of parcel no. 2), acquired during 1968, as the purchase price is unknown. ↩
6. The entire value of jointly held property is included in a decedent's gross estate unless the executor sumbits facts sufficient to show that property was not acquired entirely with consideration furnished by the decedent↩ * * *. [Sec. 20.2040-1(a), Estate Tax Regs. Emphasis supplied.]
7. See footnote 4, supra↩. 8. This figure includes only the gain or loss element of the property sales in order to avoid counting the same dollars twice where the moneys have been reinvested. Were we to have used the amount realized instead, this figure would have been $ 257,561.19. We have thus construed the facts in the light most favorable to the respondent, in view of petitioner's burden.↩
9. It has been held in several cases that the wife's participation in the family business created a relationship, be it founded in a partnership or an implied contract to share in the earnings, sufficient to be counted as a consideration in "money's worth" by the wife to the acquisition of the jointly held assets. Estate of Berkowitz v. Commissioner, 108 F.2d 319 (3d Cir. 1939); Richardson v. Helvering, 80 F.2d 548 (D.C. Cir. 1935). We do not here consider whether the present case falls within the ambit of the cited cases, as we are not treating Novice's services as consideration, but merely as a factor in our conclusion that she did in fact supply her own separate funds in purchasing the properties. See also section 2040(c), which allows a limited exclusion where the spouse of the decedent materially participated in the business. This provision applies only to estates of decedents dying after December 31, 1978. Section 511(b), Revenue Act of 1978, 92 Stat. 2882.